## Case No. 16,846a.

VANDEWATER v. WESTERVELT.

[18 Betts' D. C. MS. 22.]

District Court, S. D. New York. 1851.

COLLISION — VESSEL AT ANCHOR — CONFLICTING EVIDENCE—MUNICIPAL REGULATION—ENFORCEMENT IN ADMIRALTY.

[1. In an action by the owners of a sloop against a steamer, for colliding with her while

lying at anchor with her head pointed in the same direction as the moving steamer, the evidence as to whether there was a sheer by the sloop, which caused the collision, was conflicting. *Held*, that the fact that the collision forced the steamer against a vessel lying 200 yards away, and that the blow upon the steamer was given by the stem of the sloop, and at right angles, justified a finding that such a sheer on the part of the sloop occurred.]

[2. Act New York April 12. 1848. requiring steamboats passing up and down the East river, between the Battery and Blackwell's Island, to be navigated in the center of the river, applies to a tug without any regular landing place, the business of which is to cruise along the docks, and move vessels from one pier to another, or into and out of the harbor.]

[3. The admiralty courts enforce municipal regulations which affect the equipment, position, or management of vessels within particular jurisdictions.]

[4. When a collision between a sloop and a steamer is caused partly through the gross negligence of the former in sheering while at anchor, and partly by the failure of the latter to observe a regulation requiring steamers to keep to the center of the river, it is proper to assess one-half the damages against each.]

[This was a libel by Robert J. Vandewater against Jacob R. Westervelt to recover damages caused by a collision.]

BETTS. District Judge. The sloop Novelty, owned by the respondent. was at anchor in the East river, towards the Long Island side, and from one to two hundred yards off from Jackson Ferry, heading up the river. The steam tug Margaret Kemble was running up the river, near the East shore, on her way to Wallabout for a tow. Her course was inside the sloop, there being sufficient space between her and the docks for the tug to pass. The tide was ebb. As the tug approached the sloop the latter was raising her anchor to get under way, and had her mainsail up, and. as the tug was in the act of passing, the sloop took a shear, either from her anchor being tripped, or upon her cable, and ran bow onto the larboard quarter of the tug. Both vessels were injured by the collision. The testimony taken from the two vessels is, as usual. in direct conflict as to the cause of the accident. The witnesses on board the tug testify that all the hands of the sloop were forward. and after she had taken her shear. and was upon the point of colliding with the tug. one ran aft and took the helm. but too late then to bring the sloop back to her true heading, or keep her off the tug. The witnesses for the sloop testify that a man was all the time at her helm. and that the tug, crowding up between her and the docks in order to avoid some impediment there. bore athwart her bows, and ran directly upon the sloop; that her anchor had not been tripped; and that she did not shear or move from her position until struck.

The testimony of the witnesses on both sides is to be received with caution and distrust. It has become almost an axiom in the law of evidence that witnesses so situated will support the correctness of their own conduct in the management of their respective vessels, and are equally prone to defend the vessel to which they are attached. There are some circumstances tending to entitle witnesses on the steamer to higher credit, as to this particular fact, than those of the sloop; but, regarding the direct testimony as in equilibrium, there is a collateral fact which very conclusively shows that the sloop made a movement at the time, and in such manner as to cause the collision. Indeed, her pilot admits she was on a shear. The testimony for the respondent, in concurrence with that for the libellant, shows that the striking of the two vessels pressed the steamer against another vessel lying at the dock,— a fact which could not be expected to happen if the sloop continued at her position two or three hundred yards off, nor could it have happened physically if, as alleged by the witnesses on the sloop, the steamer had not stopped her wheels, and was working them ahead when she struck. It is alike inconsistent with another particular admitted by all the proofs,—that the collision crowded the tug against a schooner at the dock, and that the sloop, according to the evidence of the pilot, was not more than her length from the dock at the time. These probabilities, in cases of conflicting evidence. properly guide the decision of the court. The Mary Stewart, 2 W. Rob. Adm. 244. Besides, the place the blow was received on the tug, and the force and direction of it, demonstrate that it was given by the stem of the sloop, and directly and nearly at right angles, which is wholly inconsistent with the theory that the tug had received such an injury, going up the river the same direction the head of the sloop lay, by the act of crossing her bows.

I hold it clear. therefore, upon the proofs, that the movement of the sloop towards the steamer. when the two were so near together that the steamer could not avoid her, caused the collision. The movement was by a sudden shear on the cable, owing to the negligence of the man at her helm, or the want of a person there. or. which is perhaps more probable, owing to the anchor having broken ground, and the wind from the S. W. driving her stem up the river. In either supposition. the shear and change of direction of the sloop from about N. W. to S. W. would have been easily prevented by her helm, if properly managed, and it was gross negligence of those having charge of her to permit the shear. The fault of the sloop has therefore contributed to the injury received by the steamer. and she would be responsible for all the consequences. if the steamer was clear of blame on her part.

By an act of the legislature of the state of New York passed April 12. 1848 (Sess. Laws. c. 321. p. 450), it is enacted that all steamboats passing up and down the East river. between the Battery, at the southern extremity of the city of New York, and Blackwell's Island. shall be navigated as near

as possible in the centre of the river, except in going into or out of the usual berth or landing place of such steamboat. This statute, it is claimed by the respondent, compelled the tug to head to the middle of the river, and that she, in her own wrong, attempted to force a passage between the sloop and shore, and far out of the middle of the stream. It is argued for the libellant that the act applies only to passenger and freight boats navigating through the East river into and from the Sound, and which have regular berths or landing places at New York. It is proved, to show the tug is not within the scope of the act, that she has no regular berth or landing place, her business being to cruise along the docks, and move vessels from one pier to another, or take them out or bring them into the harbor, and their appropriate landing places. It is further urged that the admiralty courts do not notice merely municipal regulations of the ports, but administer only the principles of the general law.

Neither of these points, in my judgment, is tenable. The act is universal in its terms. It embraces every description of steamboats plying in the locality designated. It does not look to the fact of the boat having a berth or landing place as characterizing her, and thereby bringing her within the scope of the act, but affords her an excuse for being out of the middle of the river, if she is in the act of leaving or making her berth. The construction contended for would exempt all steamboats from New Jersey or Connecticut, or other foreign ports, passing through the East river without making a landing at the city, from the provision of the act,—a mischief within its manifest contemplation, and one needing the application of the remedy not less than when the boat chanced to have a regular berth or landing place at the city wharves.

The admiralty court does not enforce, as a ground of action, regulations which are purely municipal, but where they affect the equipment, position, or management of vessels within particular jurisdictions, the rule established by them is observed and applied in this court equally as in the local courts. Abb. Shipp. 184, note. The supreme court recognize this admiralty rule as a just interpretation of the common-law obligation. Smith v. Coudrey, 1 How. [42 U. S.] 29. Accordingly it is held to be a fault in a vessel anchoring off the piers within a distance less than three hundred yards, or lying at anchor in the harbor at nighttime without exposing a light in the rigging (The North America [Case No. 10,313]), or for one steamer to attempt to pass another, both going the same way, within a less distance than twenty yards (The Rhode Island [Cases Nos. 11,743 and 11,745]). The

English admiralty follow the same rule, especially in actions in personam. The Girolamo, 3 Hagg. Adm. 176, 177. In a crowded thoroughfare similar to that of the East river, and lined on both shores with numerous slips and piers, from which vessels are constantly coming out into the stream, the regulation adopted by the statute is of a character to demand the respect and observance of all tribunals,—not less so, certainly, than a code of rules adopted by the Trinity masters in England, which are enforced by the admiralty there (The Gazelle, 1 W. Rob. Adm. 471), a regulation which prohibits a steamer coming into a crowded harbor at high speed, and which our courts cause to be observed. See decision of superior court on this subject. Fitch v. Livingston (April 12, 1852) 11 Am. Law J. (N. S.) 449.

I have no hesitation in declaring that an obligation imposed on steamers by the state law is one which this court should enforce as in consonance with the principles of maritime law, and eminently conducive to the safety of navigation in that most crowded and difficult thoroughfare, and that the tug, on the occasion in question, was acting in violation of the law, and was accordingly wrongfully attempting to run between the sloop and the shore. This fault, if it did not itself produce the accident, contributed to the collision which ensued. It was, no doubt, the duty of those in charge of the sloop to have done all in their power to prevent the collision, although it was seen that the tug was in an unauthorized position. The Blenheim, 2 W. Rob. Adm. 422. And she could have been effectually avoided by a proper attention to her helm. This cause, then, is one in which there has been a want of due diligence on both sides, without wilful neglect or intent to do wrong. The steamer, to gain the benefit of a weaker head tide, ran out of her proper course, near the docks, yet then might have safely passed the sloop, had she remained stationary as she was anchored when the tug neared her, or had she sheared in aid of the tug. The tug having no right by law to be in that position, if she had in that course collided upon the sloop she must have borne the consequences of any injury to the latter. But her being in an improper position did not excuse the sloop in an act of negligence or mismanagement which inflicted an injury upon her. The Hope, 1 W. Rob. Adm. 154. The collision in this case, therefore, resulted from the fault of both parties; and, according to the rule prevailing in this court, the consequences must be equally borne by both. Story, Bailm. § 608a. Reference to a commissioner to ascertain the damage to the two vessels, to be equally divided between them. Each party to bear his own costs. 1 W. Rob. Adm. 26.